May it please the Court, my name is Mark Caldwell and I'm here this morning representing Mr. Galvan in this Social Security matter. Before you actually begin your argument, Counsel, I'd like the government to know a couple of things. I already told him. You told him? Just so it's fully fleshed out, his partner, Ed Ober, is someone I know and in the past I've sent him Social Security business when I was in practice. His brother, Ron, is one of my closest friends. And I represented his parents 10 years ago when I was in private practice. I don't think that will affect my abilities as an impartial jurist, but I wanted you to know that. Thank you, Your Honor. The government has no objection. Thank you. Go ahead. I appreciate that, Judge. With the Court's permission, I would like to reserve two minutes of my time for rebuttal. Without meaning to be presumptuous, I think the real issue in this case is whether the matter should be remanded for award of benefits or remanded for further proceedings. The reason I say that I think that's the real issue in this case is I do not believe that the ALJ's reliance upon the medical vocational guidelines, when the ALJ herself recognized that the claimant's vertigo was so severe as to get him past Step 4 of the sequential evaluation process where he couldn't perform his past work, can possibly be a basis for a decision, since vertigo is a non-exertional impairment and the medical vocational guidelines do not apply in such instances. Having said that, I believe this matter should be resolved by remand for award of benefits. The primary reason that I base that argument is the opinion of Dr. Nolan. He's the rheumatologist. The problem that the ALJ and, frankly, the district court had in this case is they were mixing apples and oranges. We have Dr. McKenzie, a neurologist, doing quite a workup for neurological impairments, and I have no quarrel at all with Dr. Nolan's opinion so far as it goes. But what the ALJ did in this case is she took that opinion regarding neurological impairments and made it a global assessment that covered everything, including the fibromyalgia. Dr. McKenzie's records, the neurologist, mentioned fibromyalgia one time, and the one time is when he's referring to the fact that Dr. Nolan is the one who's treating the claimant for it. So there is no conflict between the physician's opinions in this case, and therefore the clear and convincing standard should be used to evaluate the ALJ's rejection of Dr. Nolan's opinion. The ALJ, I respectfully submit, did what I call acting as an expert witness. The ALJ said, well, there's no medically determinable reasons why Dr. Nolan should reach this conclusion. The ALJ may have expertise in the law, but the ALJ does not have expertise in medicine and should not be reaching independent medical conclusions, which, effectively speaking, that was. Is this a case where the ALJ used the opinion of the neurologist to exclude the opinion of the rheumatologist, or a case where the ALJ took both into consideration and found the opinions, both of whom were treating physicians, as I understand it, took both of them into consideration and thought the neurologist's opinions more persuasive? One or the other? Yes, it's the former. And what do you point to to say that what the ALJ did was take the opinion of the neurologist to exclude the opinion of the rheumatologist? Effectively speaking, because she said that's what she did, in the opinion, the ALJ said I'm giving Dr. Opinion's controlling weight and I'm giving Dr. Nolan's opinion little weight. And not to repeat myself, but the record is clear that Dr. McKenzie did nothing in terms of the claimant's fibromyalgia. And therefore, those are not conflicting opinions. There are other issues in this case, and I mention them only in passing because I don't believe this Court needs to reach them. The reliance upon the opinions of non-examining State agency physicians, it's an issue, but this Court need not reach it once it gives proper weight to Dr. Nolan's opinion. The claimant's credibility could be an issue, but I don't think this Court needs to reach that either once it considers Dr. Nolan's opinion. The one weakness that I will admit is when the Commissioner talks about the length of time that Dr. Nolan treated the claimant versus the length of time that Dr. McKenzie treated the claimant, given Dr. McKenzie treated the claimant longer. Is that enough in and of itself to justify rejection of the treating rheumatologist's opinion? No, it isn't. This Court on many occasions has upheld ALJ's determinations based on opinions from physicians who have had much less contact with the claimant than that. Now, the ALJ, I mean, the ALJ said that it wasn't clear, at least to him, whether Dr. Nolan found the claimant met the criteria on fibromyalgia as of November 1999. Do you disagree with that? That was the first visit, Your Honor. You know what, I can't carry the dates of this guy's visits in my head. It was, it was. You know, it's true. Dr. Nolan said in one respect, in one respect only, the claimant did not head on meet the criteria for fibromyalgia. All right. So then if that's the case, why is it reversible that the ALJ decided to give greater weight to McKinsey's as he treated the Petitioner over a very long period of time? Two reasons. One, the one respect was simply the number of trigger points on the first visit only. The number of trigger points is only one of many criteria for diagnosing fibromyalgia. And it's, it should be noted that thereafter, Dr. Nolan consistently found the claimant met the criteria for fibromyalgia. But what is more significant is, and by the way, let me also add, this Court has reversed and remanded for payment of benefits in a similar case where the physician did not find the requisite number of trigger points. That's the Lange case. But the more significant factor is, is that a neurologist's opinion, which does not evaluate all of the impairments in the case, cannot be found to be given controlling weight to discount those impairments that the neurologist did not evaluate. And so that's why I say that there is, there is no conflict between these physicians' opinions. Dr. Nolan's opinion should be accepted as a matter of law. That's spatially inconsistent with the ability to sustain work activity. And the remedy here is remand for payment of benefits. May I reserve the remainder of my time? Sure. Okay. Mr. Berger. Good morning. My name is Alan Berger. I represent the Commissioner of Social Security in this case. The first thing that Appellant's counsel brought up was the use of the medical vocational guidelines. And I read his reply brief, and he indicated that the Commissioner may be confused as to the use of the grids. It's very clear in this case how the grids were used, and that's a nomenclature we have for the medical vocational guidelines. The first thing that happens is the ALJ determines the RSC, and we're at the fifth step. After the ALJ determines the RSC, the ALJ determines whether, given all the rest of the medical vocational factors, the grids direct a finding of disabled or not disabled. If the grids direct a finding of disabled, it's over. If it directs a finding of not disabled, then the ALJ is required to determine if the job base is significantly eroded by any non-exertional impairments. In this case, it was non-exertional impairment vertigo, which prevented the appellant from driving. And when the ALJ decided that driving would not significantly erode the job base at the light level, therefore the ALJ, using the grids as a framework, found appellant was not disabled. Only if the jobs have been significantly eroded would a vocational expert have to be identified. And it really doesn't matter at step four that vertigo precluded appellant from doing his job, because vertigo, according to the medical records, and there were three doctors, well, two doctors who said that, Dr. McKenzie and Dr. Carter said that if he has vertigo, he can't drive, basically. And his job was a bus driver. Hence, he couldn't perform his past work. And you go to the next step. So vertigo at step four precluded the past work. Then you go to the next step to determine if he can perform other work in the national economy, and he could. Did the diagnosis of the neurologist necessarily exclude the diagnosis of the rheumatologist? No, it didn't. If I understand your question correctly, I don't believe it did. I believe that Dr. McKenzie, from the record, you can tell when he issued his opinion that appellant could perform light work but not be able to drive, was considering all of his impairments. If you look at what appellant brings up in his brief, he's basically saying that Dr. McKenzie only saw him for his vertigo. But if he only saw him for his vertigo, why did he limit him to light work? That doesn't make sense. Vertigo doesn't, as far as I know, preclude the ability to lift. Hypothetically, if neurologist A examines a claimant or potential claimant and renders a diagnosis, and then Dr. B, a rheumatologist, diagnoses fibromyalgia, are those necessarily inconsistent with one another? Not inconsistent, but I think Dr. McKenzie recognized that there was a non-neurological reason for appellant's pain in this case. So I think that the diagnosis of the If they're not necessarily inconsistent with one another, how can one be used to exclude the other? The neurologist can exclude all medical impairments that he reviews. This is not a case where the neurologist said this patient does not have fibromyalgia, correct? He did not say that, no, Your Honor. But the rheumatologist said he did. The rheumatologist, I'm not sure exactly. The rheumatologist said fibromyalgia. He said fibrocytis. We don't have all the requirements for a fibromyalgia diagnosis in the record, and the ALJ recognized that. But eventually he did, Dr. Nolan did say appellant did have fibromyalgia. I'm not sure how he heard that. As a matter of medical specialty and the like, who is more qualified to determine whether a patient has fibromyalgia, a neurologist or a rheumatologist? I believe any medical doctor can say it. I'd ask you who, if any could, who is more qualified, a neurologist on the one hand and a rheumatologist on the other, to diagnose fibromyalgia? If you're going to give me two of them, I couldn't tell you. I think a neurologist could diagnose fibromyalgia just as well as a rheumatologist can. But a rheumatologist probably, if you have someone with fibromyalgia, might be the better specialty to go to in order to treat the disease. And isn't there some evidence of record that at least one of the neurologists that treated Galvan referred him to a rheumatologist? Yes, there is. And he was referred to a rheumatologist. And Dr. Carter, even before Dr. McKenzie recognized it, said he has fibrositis. And so he did have fibromyalgial pain. Whether it was fibromyalgia or not, I don't think is absolutely relevant. So this does not appear to be a case where the claimant went to one doctor and didn't like the diagnosis and went to another. Is there any evidence of that? I don't think he was doctor shopping. I think he was actually going from one doctor to another, and they were all consulting with each other. But I do believe that Dr. McKenzie, if you look at the record, considered the fibromyalgia in determining his appellant's ability to work. And also Dr. Carter, I'd ask the Court not to forget we mentioned in the Statement of Facts, Dr. Carter in May of 1999, and that's found at page 176, said that plaintiffs could perform light work. The opinions are inconsistent. There's no question about that. You have one doctor saying there's light work and one doctor saying that basically the person is disabled. Those are inconsistent decisions. They both considered his complaints of pain. Dr. McKenzie, before he issued his opinion, did a complete neurological check of the plaintiff, took into account his pain symptoms, and said they could perform light work. The ALJ made a finding in support of the conclusions that Galpin was able to vacuum his own apartment. Do you recall that? I'm not sure it was his own apartment. He was vacuuming. And as an indication that there was some work he could perform. That was an instance where daily activities of a claimant supported the ALJ's decision. It was just one part of it. He had an explanation for that, though, didn't he? He had an explanation for an instance when he was vacuuming and when he fell down. As was in the brief, we're not sure exactly what the explanation was referring to. Did the ALJ address that explanation? The ALJ did not. But the vacuuming is a very small portion of the credibility assessment. There are other things in the credibility assessment that the ALJ considered. Most importantly was Dr. McKenzie's opinion of light work. But, of course, you can't just rely on the medical evidence. You have to rely on the evidence and the record as a whole. So he could consider that the ALJ could consider that Plaintiff was able to ride with his wife to work. The ALJ could consider that he was able to take care of his children and walk them to the bus stop. Those were all legitimate considerations for the ALJ to make. So if you don't accept the vacuum cleaning explanation that the ALJ gives, I believe that the record still supports affirming the ALJ's decision. We have controverted medical opinions. The ALJ looked at Dr. McKenzie's report, looked at Dr. Nolan's report, gave Dr. McKenzie's report more weight. The ALJ was entitled to do that. He took into consideration the specialties. He took into consideration, very importantly, the length of time that the appellant was seen by each of the physicians. And he took into account the fact that Dr. Nolan's notes didn't support his statement. Even if Dr. Nolan's statement was the only one in the record, it may not have stood. Because if you look at his treatment notes, nowhere does Dr. Nolan say that the appellant had any limitations, let alone the limitations that he described that would preclude him from working. There's nothing in there that would indicate that, for example, he couldn't sit for more than two hours. They couldn't lift more than five pounds. That he could not bend, squat, crawl, climb and reach. There's nothing that supports it in his treatment notes. The ALJ recognized that, and therefore, Dr. Nolan's opinion was given less weight. The decision of the commissioner is supported by substantial evidence, and the commissioner would urge this panel to affirm the district court's decision and her decision. Subject to any questions? I don't think so. Thank you, Mr. Berger. Mr. Caldwell? Very little by way of rebuttal, Your Honors, but I do want to make three points. One, the commissioner has it backwards when the commissioner says that vertigo doesn't have a significant effect on the occupational base, and therefore, the medical vocational guidelines aren't applicable. It's vocational expert testimony that is needed to establish whether vertigo has a significant impact upon the occupational base. That judgment can't be made by an ALJ without that expert testimony. The other point is this business about reliance upon the treatment notes. I run into this all the time. Doctors don't make vocational assessments in their treatment notes. They write down notes about treatment. I have a friend who's a quadriplegic, and I asked him one time whether his doctors ever told him not to walk, and he said no, and I asked him why. He said, because I think it's pretty obvious they know that I can't. There's no reason to put that sort of thing in treatment notes. The last point that I want to emphasize is the argument regarding remand for payment of benefits. The commissioner cited supplemental authority. This Court's decision last year in the Connett case, C-O-N-N-E-T-T, where that panel said that it wasn't convinced that the crediting as true doctrine was mandatory in the Ninth Circuit. But that decision didn't provide any guidance about when you should remand for payment of benefits versus further proceedings or not. That panel relied upon the Burns case, B-Y-R-N-E-S. And what happened in the Burns case is a reason why the crediting as true doctrine is important. I represented Jimmy Burns. He was my client. And after his case was remanded for further proceedings, he died before an administrative decision was made. That's the reason why the crediting as true doctrine is important, not the other way around. All right. Thank you, Mr. Caldwell. The matter just argued will be submitted. And we'll turn next to Castillo.
judges: Rymer, Hawkins, Bybee